# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Genevieve Kloss,<br><br>        Plaintiff,<br><br>v.<br><br>Wal-Mart Stores, Inc.,<br><br>        Defendant. | Case No. 11-cv-3382 (SRN/JJK)<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Gordon H. Hansmeier and Matthew W. Moehrle, Rajkowski Hansmeier Limited, PO Box 1433, St. Cloud, MN 56302, for Plaintiff.

Christopher G. Angell and Steven J. Kirsch, Murnane Brandt, PA, 30 East Seventh Street, Suite 3200, St. Paul, MN 55101, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter came before the Court on Defendant Wal-Mart Stores, Inc.'s Motion to Exclude Expert Testimony of Dr. Michael Neudecker and Dr. Merlin Brown and Motion for Summary Judgment. (Doc. No. 16.) For the reasons set forth herein, the Court denies Defendant's motions.

## I.     BACKGROUND

Plaintiff Genevieve Kloss is an 89-year-old woman and a type-2 diabetic. (Moehrle Aff., Doc. No. 23, Ex. A, Depo. of Genevieve Kloss ("Kloss Depo.") at 5; Ex. B, Depo. of Michael Neudecker ("Neudecker Depo.") at 11.) On October 23, 2005, Plaintiff started a medication called Lantus for her diabetes. (Neudecker Depo. at 20; Compl. ¶ 3.) Lantus, unlike other types of insulin, is not fast acting. (Neudecker Depo. at 22.) Plaintiff typically

1

had her medications mailed to her by Defendant's pharmacy, located at 15091 18th Street Northeast, Little Falls, Minnesota.  (Kloss Depo. at 18; Compl. ¶ 4.)  Plaintiff, or someone acting on her behalf, called Defendant's pharmacy around July 1, 2011, requesting a refill of her Lantus prescription.  (Compl. ¶ 4, Ex. A.)  On July 5, 2011, however, Defendant's pharmacy mistakenly mailed Plaintiff a prescription for Novolog FlexPen insulin ("Novolog") that was intended for another customer.  (Id. at ¶¶ 5–6, Exs. B–C.)  Novolog insulin is released rapidly into an individual's system.  (Id. ¶ 10.)

Plaintiff did not realize that the prescription sent to her was not Lantus, put the medication in her refrigerator and used it as if it was Lantus.  (Kloss Depo. at 27; Compl. ¶ 8.)  Unknowingly, Plaintiff testified that she took Novolog each night before going to bed from the time she first received the wrong medication from Defendant, including the night of July 28, 2011.  (Kloss Depo. at 40–41.)  When Plaintiff woke up the following morning, she discovered that she was on the floor next to her bed.  (Id. at 21.)  Because Plaintiff was unable to get up, she pressed her Lifeline button and Lifeline contacted Plaintiff's son, who lives next door to Plaintiff.  (Id. at 22.)  Plaintiff does not remember falling out of bed or when she fell, but guesses she was on the floor for about an hour before her son arrived at approximately 6:00 a.m.  (Id. at 21–23, 52.)

Once Plaintiff's son arrived at her home, he contacted his sister, who arrived at approximately 7:00 a.m.  (Id. 24.)  Plaintiff's children brought Plaintiff to St. Gabriel's Hospital emergency room around 9:00 a.m. and advised the staff that she had fallen, but had no memory of the fall.  (Id. at 39–40.)  Plaintiff was then transferred to St. Otto's hospital where the staff asked one of Plaintiff's daughters to go to Plaintiff's home and retrieve her

medications. (Moehrle Aff., Doc. No. 23, Ex. D, Depo. of Sandi Hansen at 30.) Plaintiff's daughter subsequently went to Plaintiff's home, took everything out of the compartment in the refrigerator where Plaintiff kept her medications, and brought them to St. Otto's. (Id. at 30–31.) St. Otto's advised Plaintiff's daughter that Novolog was not the insulin Plaintiff had been prescribed and notified Dr. Neudecker. (Id. at 30.)

## A.     Dr. Michael Neudecker

Dr. Michael Neudecker, a family practice doctor at the Family Medical Center in Little Falls, Minnesota has treated Plaintiff for over twenty years as her regular treating physician. (Pl.'s Mem. in Opp'n to Def.'s Mots. to Exclude Expert Test. and for Summ. J., Doc. No. 22 ("Pl.'s Opp'n Mem."), at 5.) He graduated from St. Cloud State University with an undergraduate degree and from the University of Minnesota Medical School with a medical degree. (Angell Aff., Doc. No. 20, Ex. 50 at 1.) Dr. Neudecker completed a family practice residency in Grand Forks, North Dakota. (Id.) He is licensed by the State of Minnesota to practice medicine and has been employed by the Family Medical Center for more than 25 years in the area of family practice. (Id.)

Dr. Neudecker saw Plaintiff as a patient in the weeks before the fall at issue in this case. On July 19, 2011, Plaintiff had an appointment with Dr. Neudecker and reported anxiety, excessive worrying, insomnia, irritability, and nervousness. (Neudecker Depo. at 34–35.) Plaintiff also told Dr. Neudecker that she was unable to sleep the previous few nights. (Id. at 35.) She was prescribed Citalopram and Lorazepam to alleviate her anxiety and insomnia. (Angell Aff., Doc. No. 20, Ex. 27 at 2.)

Dr. Neudecker saw Plaintiff again on July 20, 2011. (Id. Ex. 28) Plaintiff reported

that the Lorazepam had markedly helped her anxiety and she was feeling well.  (Id.)
Plaintiff's lab tests on July 20, 2011 showed a non-fasting blood glucose reading of 62,
which was "a little on the low end" according to Dr. Neudecker.  (Neudecker Depo. at 37.)

Dr. Neudecker believes that Plaintiff's fall on July 29, 2011 caused her to suffer a
hematoma.  (Id. at 46.)  The CT scan report identified that Plaintiff's head injury had both
acute and chronic components; with the acute symptoms lasting up to a day or two later.
(Id. at 46–47.)  Dr. Neudecker opines that the fact that Plaintiff took the wrong insulin
before bedtime creates a high likelihood that she could have been having hypoglycemic
spells during the night.  (Id. at 56.)  Specifically, on August 4, 2011, Dr. Neudecker wrote a
letter stating that the fact that Plaintiff was taking Novolog "gives a high likelihood that she
could have been having hypoglycemic spells during the night" and that this "certainly could
lead to many of the problems she was having with sleeping and falling."  (Angell Aff., Doc.
No. 20, Ex. 36.)  The letter also stated that "[h]ow much of her confusion and anxiety might
have been related to this is unknown . . . . Certainly hypoglycemia could cause her to get
confused, to fall, to have any number of nighttime symptoms."  (Id.)

Dr. Neudecker submitted an expert report in this case on February 17, 2012.  (Angell
Aff., Doc. No. 20, Ex. 50.)  In his report, Dr. Neudecker stated:

> I am familiar with [Plaintiff] coming to the clinic in July of 2011 with a
> family member complaining of agitation, dizziness, worry[,] anxiety[,]
> insomnia, irritability, and nervousness.  The timing of these symptoms
> correspond to an error made by [Defendant] by sending her NovoLog . . . . [i]t
> is my opinion the error of prescription led to the issues presenting themselves.
> . . .  In addition, during this time of taking the wrong insulin, she fell due to
> her instability caused by the prescription error, and sustained a bruised head
> and back.  I am of the opinion these symptoms are directly related to the
> incorrect prescription dispensed to her.

(Id. at 1.)  Dr. Neudecker ultimately concluded that Plaintiff's "hospital stay, the clinic visits, the nursing home stay, and the residency at the extended care facility, both in the past and into the future, are directly related to her receiving the prescription in error."  (Id. at 2.)

Dr. Neudecker submitted a rebuttal expert report on June 12, 2012.  (Angell Aff., Doc. No. 20, Ex. 56 at 1.)  His rebuttal report stated:

> While there are potential causes for the anxiety experienced by [Plaintiff] including her advancing age, the prescribing of other drugs, and unrelated medical conditions, the fact remains and my opinion remains the cause of her confusion, anxiety, and her fall in July of 2011 was the incorrect prescription sent by [Defendant].  Her periods of difficulty began shortly after the wrong prescription was sent to her and once we discovered the wrong prescription in late July the symptoms we were attempting to treat began to dissipate and her condition improved.  The correlation between her condition and the incorrect prescription leads me to my opinion the insulin error was the cause of her anxiety, falls and inability to live independently.

(Id.)

Defendant deposed Dr. Neudecker on August 10, 2012.  (Neudecker Depo. at 1.)  Dr. Neudecker explained at his deposition that an elderly person who is having a hypoglycemic episode "might not have the concentration or ability to actually think about checking their sugar."  (Id. at 57.)  He explained that "[i]deally" Plaintiff would have gathered scientific evidence of a hypoglycemic nighttime spell by taking her blood sugar when she went to bed on July 28, 2011, or in the morning on July 29, 2011.  (Id.)  Dr. Neudecker explained that he based his causation opinion on circumstantial evidence and stated:

> That's all we have is circumstantial evidence.  We have that she got the insulin, she got—around that time started getting agitated, she fell, she went into the nursing home.  According to what I've heard from the nursing home and the records I have from the nurses at the nursing home there's no indication that she had further agitation or paranoid ideation or problems that

she had once they've adjusted her insulin.  So she had an episode during those weeks when she had that insulin in hand, before then my charts show she wasn't having problems, and after her insulin was changed back it shows she's not having those problems either.

(Id. at 71–72.)  Dr. Neudecker also testified that he used the following methodology to reach his opinions:

I guess I would say she was doing fine, she got—the only drug change that was causing at least the agitation was the change in insulin.  The—granted she—other drugs were added to control that behavior, but that behavior, in my opinion was caused by giving her the insulin.  Now she's agitated and now she's not sleeping at night.  She's upset.  She's worried.  She's getting paranoid ideation, and if you affect a person's sleep at night they're going to—the effects build up and we were giving her mediations to calm her down.

Now, you could argue some of those medications could make her drowsy and some of those medications could make her fall, but I would have never started her on the medications if she wasn't having the agitation to begin with and so she fell, she bumped her head, she got a subdural hematoma, she got some back injuries with persisting pain, she went to a nursing home.  I don't get a single telephone call from the nursing home that she's having agitation, anxiety.

I looked through the nursing home records from the nurses' notes, she's complaining of back pain, but not complaining about agitation, not having all those symptoms, and the only thing I can see, the only difference is that she's now back on her regular insulin again that she was on before.

(Id. at 72–73.)  Dr. Neudecker testified that he had not "checked any peer review articles, publications or textbooks that . . . support [his] hypothesis that in this situation NovoLog caused the fall."  (Id. at 75.)

### B.       Dr. Merlin Brown

Plaintiff also obtained an expert report from Dr. Merlin Brown, a doctor of internal medicine, dated April 11, 2012.  (Angell Aff., Doc. No. 20, Ex. 51 at 7.)  Dr. Brown has eighteen years of experience in treating elderly patients, including those who are living

independently and those who have been transitioned into a nursing home. (Id. at 4.) Dr. Brown stated in his expert report that:

> It is my opinion, with a high degree of medical certainty, that the incorrect insulin episode precipitated the sudden decrease or step-down in [Plaintiff's] level of functioning . . . . [Plaintiff] was quite independent before the insulin incident and less independent after the incident. It is my opinion that the incident significantly affected her health, caused this rapid decline in level of functioning, and, due to her age, she was unable to recover to her previous level of function.

(Id. at 3.) Dr. Brown further stated that Plaintiff's "sudden decrease in functioning and sudden need for further care in a nursing home are the direct result of having been given incorrect insulin." (Id.)

Dr. Brown also provided a rebuttal expert report on June 14, 2012. (Angell Aff., Doc. No. 20, Ex. 57.) In his rebuttal expert report, Dr. Brown stated "[i]t remains my opinion that the incorrect insulin given [to Plaintiff in July 2011] was the cause of her medical condition . . . of subdural hematoma, hyponatremia, anxiety, and her general decline with weakness during that time." (Id. at 1.) Dr. Brown concluded that:

> [T]he sudden decline in [Plaintiff's] condition in July 2011 corresponds to the time when she was given incorrect insulin. The incorrect insulin with fluctuating blood sugars is likely the cause of her anxiety and need for anxiety medications that can contribute to falls. The subdural hematoma is clearly related to the fall with resulting hyponatremia and resulting general decline in her condition at that point.

(Id. at 2.)

Defendant deposed Dr. Brown on August 28, 2012. (Moehrle Aff., Doc. No. 23, Ex, I, Deposition of Merlin Brown ("Brown Depo.") at 1.) Dr. Brown testified that his opinions were reached after reviewing Plaintiff's medical records from the 1990s until after

Plaintiff's insulin incident.  (Id. at 10–12.)  When discussing how he reached his conclusions, Dr. Brown testified:

> We don't look at it as an isolated incident.  This is an 88-year-old lady who potentially was taking the wrong insulin for several weeks.  Her reserve is less, the insult to her system has a greater effect than on a younger person.  So if she's been taking this off and on for a few weeks, we don't know for sure the details, it's just common that somebody could fall.  Now, she could have fallen days, weeks before that, developed a subdural hematoma and maybe that's why she fell on the 28th because she already had a subdural hematoma.  The X-rays show that it was acute and subacute, so it didn't all happen on the 28th or 29th.  There's evidence that something has been happening over weeks prior to this incident.  So whether she took the NovoLog that night or not doesn't change my opinion.

(Id. at 27–28.)

Dr. Brown also testified that he performed a differential diagnosis in forming his opinion on this case.  (Id. at 52–53.)  Defendant asked Dr. Brown whether he excluded the other medications that Plaintiff was taking as a "contributing factor to the fall" and Dr. Brown responded:

> There were a lot of substantial contributing factors, medications were one of them, but the medication use was because of the anxiety she was experiencing.  So it's still my opinion that the anxiety and the change in her mental condition is the result of a subdural hematoma, which is likely from a fall, which is likely from a low blood sugar from taking the wrong insulin, so all of that contributed, absolutely.

(Id.)

Dr. Brown stated that he is 90 percent certain that the incorrect insulin and resulting fluctuating blood sugars caused Plaintiff's anxiety and need for anxiety medications that can contribute to falls.  (Id. at 61–62.)   When asked if he had consulted peer review literature or textbooks in reaching his opinions about Plaintiff, Dr. Brown responded, "Not

specifically for this case.  Everything in this case is common events in my practice, so we don't obviously look them up every time."  (Id. at 63.)

### C.    Procedural History

Plaintiff filed this suit in state court in November 2011.  (Doc. No. 1-1.)  Attached to the Complaint as an exhibit was an affidavit of Dr. Neudecker that stated:

> [Plaintiff's] use of the wrong insulin treatment in July of 2011 led to her worsening symptoms or new symptoms of anxiety, worry, insomnia, irritability and nervousness.  She also sustained a fall due to instability which resulted in a bruised back and a bruise to her head.

(Id. at Ex. E. ¶ 6.)  Defendant removed the action to this Court based on diversity of citizenship in November 2011.  (Doc. No. 1.)  Defendant admits that it breached the standard of care owed to Plaintiff, but denies its breach caused any damages to Plaintiff.  (Angell Suppl. Aff., Doc. No. 30, Ex. 60.)

Defendant moves for summary judgment on Plaintiff's claims.  (Doc. No. 16.) Defendant contends that Plaintiff has failed to provide sufficient evidence of causation.  In particular, Defendant argues that Plaintiff has not submitted admissible expert evidence showing that Plaintiff's injuries were caused by Defendant's conduct.  Defendant seeks to exclude the opinions of Plaintiff's experts Dr. Neudecker and Dr. Brown because they "are not sufficiently reliable to permit their consideration by a jury."  (Def. Mem. in Supp. Mot. to Exclude Expert Test. and Summ. J., Doc. No. 18 ("Def.'s Mem."), at 32.)  Defendant also argues that Plaintiff's experts should be excluded for procedural reasons because Plaintiff failed to comply with Minn. Stat. § 145.682 requiring service of certain Expert Affidavits.  (Id. at 39–43.)  Defendant claims that absent Dr. Neudecker and Dr. Brown's testimony on

causation, there is no genuine issue of material fact regarding whether Defendant caused Plaintiff's injuries.

## II.    DISCUSSION

### A.    Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted. See Lauzon v. Senco Prods. Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citations omitted). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. Id. Second, the proposed witness must be qualified. Id. Third, "the proposed evidence must be reliable or trustworthy in the evidentiary sense, so that if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." Id. (citation omitted). These requirements reflect the analysis enunciated by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), as codified in Rule 702. Id. The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable." Daubert, 509 U.S. at 589, 597–98; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 146 (1999) (extending Daubert to technical and other specialized expert testimony).

"Trial courts have substantial latitude to determine whether specific expert testimony is reliable." United States v. Larry Reed & Sons P'ship, 280 F.3d 1212, 1215 (8th Cir. 2002). Trial courts should apply the principle that "[e]xpert testimony is admissible if it is reliable and will help the jury understand the evidence or decide a fact in issue." Hartley v. Dillard's, Inc., 310 F.3d 1054, 1060 (8th Cir. 2002). "[A]n expert's testimony need not

relate directly to the ultimate issue that is to be resolved by the trier of fact, it only need be relevant to evaluating a factual matter." Smith v. BMW N. Am., Inc., 308 F.3d 913, 919 (8th Cir. 2002); see also Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir.1998) (experts offering a global understanding of the possible causes of an injury are useful to a jury).

The Court's focus should be on whether the testimony is grounded upon scientifically valid reasoning or methodology. United States v. Dico, Inc., 266 F.3d 864, 869 (8th Cir. 2001). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Bonner v. ISP Techs., Inc., 259 F.3d 924, 929–30 (8th Cir. 2001) (internal citations and quotations omitted).

Expert testimony also must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for the opinion to be useful to the jury. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). However, doubts regarding usefulness should generally be resolved in favor of admissibility. Clark, 150 F.3d at 915.

Applying this test to Dr. Neudecker and Dr. Brown's proffered expert opinions, the Court finds their opinions sufficiently reliable to be admitted under Rule 702 and Daubert. Courts analyze reliability from a flexible, case-specific standpoint. Kumho Tire, 526 U.S. at 149–150. Defendant does not challenge Dr. Neudecker and Dr. Brown's qualifications, but

rather, argues that their opinions are not based on scientific evidence or generally accepted and well-documented studies. In <u>Kumho Tire</u>, the Court made clear that the reliability test under Rule 702 is an individualized test whose relevant factors will depend on the type of expertise at issue in a given case. <u>See id.</u> (stating that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience. . . . [T]here are many different kinds of experts, and many different kinds of expertise.") (citation omitted). "Failure to perform independent testing of a well-established principle, or to submit a conclusion based on long-accepted theories to peer review, does not render an opinion unreliable or inadmissible." <u>See</u> <u>Johnson v. Zimmer, Inc.</u>, No. 02-cv-1328, 2004 WL 742038, at *4 (D. Minn. Mar. 31, 2004) (citing <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 720 (7th Cir. 2000)). The Eighth Circuit has stated that "a plaintiff need not introduce epidemiological evidence of causation in order to satisfy <u>Daubert's</u> threshold of admission of expert medical testimony." <u>Glastetter v. Novartis Pharm. Corp.</u>, 252 F.3d 986, 922 (8th Cir. 2001).

Here, both Dr. Neudecker and Dr. Brown have made clear that their opinions are based on their personal knowledge and clinical experience in treating elderly and diabetic patients. Both have testified that the medication Plaintiff had taken and its effects on the body are well known to them in their practice of medicine. Dr. Neudecker has personal knowledge of Plaintiff from being her treating physician for over twenty years in addition to his experience practicing family medicine where he frequently sees elderly patients with diabetes. Similarly, Dr. Brown testified that he has over eighteen years of experience treating elderly patients, many of whom have diabetes. Both also testified that they are familiar with the medications at issue in this case and their impacts on the body. As such,

the Court determines that Dr. Neudecker and Dr. Brown's expert opinions are admissible under Rule 702.

Defendant also argues that both Dr. Neudecker and Dr. Brown's opinions are unreliable because they rely on a "temporal connection between a substance and symptoms—without more—[which] is insufficient evidence of causation." (Def. Mem. at 29.) Defendant cites <u>Wilert v. Ortho Pharm. Corp.</u>, 995 F. Supp. 979 (D. Minn. 1998), in support of this argument. In <u>Wilert</u>, the plaintiff began treatment for a respiratory condition in October 1992. <u>Id.</u> at 980. After her symptoms persisted, her doctor prescribed Floxin, a medication manufactured by the defendant in March 1993. <u>Id.</u> Plaintiff finished taking Floxin on May 10, 1993 and on May 31, 1993 went to the emergency room where she was diagnosed with autoimmune hemolytic anemia ("AIHA"). <u>Id.</u> A week later, she was diagnosed with Guillain-Barre Syndrome ("GBS"), a neurological disorder. <u>Id.</u> at 980–81.

Plaintiff then sued defendant, claiming that her AIHA and GBS diseases were caused by Floxin. <u>Id.</u> at 981. Plaintiff retained a medical doctor as an expert who opined "[i]t is probable to a reasonable degree of medical certainty that the hemolytic anemia and Guillain-Barre syndrome developed by [plaintiff] are causally related to her treatment with Floxin for the period between March 31 and May 2, 1993." <u>Id.</u> at 981. The defendant in <u>Wilert</u> moved to exclude Plaintiff's expert report based on <u>Daubert.</u> <u>Id.</u> The court granted defendant's motion and determined that the expert's report was unreliable. <u>Id.</u> The court stated that it "considers it important that [the expert] is unable to point to any study linking Floxin to AIHA or GBS." <u>Id.</u> The court also noted that the causation theory was based on temporal proximity, which was not reliable. <u>Id.</u> at 982.

Defendant argues this action is analogous to <u>Wilert</u> because the Plaintiff's experts rely on the temporal proximity between Plaintiff's ingestion of the wrong medication and her fall to prove causation. Defendant states "Plaintiff's experts' specific causation opinions are founded upon nothing more than temporal proximity between Plaintiff's receipt of the Novolog and the manifestation of her symptoms." (Def. Reply Mem., Doc. No. 29, at 4.) Plaintiff responds that <u>Wilert</u> is different from the present action because this case deals with the physiological effects of taking the wrong insulin. Both Dr. Neudecker and Dr. Brown testified at their depositions that they are familiar with the side effects of Novolog and Lantus in their medical practices. Additionally, both doctors have said that the effects Plaintiff would have suffered from taking Novolog were well-known.

The Court agrees with Plaintiff. The court in <u>Wilert</u> based its decision on the fact that it "consider[ed] it important that [the expert witness was] unable to point to any study linking Floxin to AIHA or GBS." 995 F. Supp. at 981. Here, there is no dispute that the insulin Plaintiff took—Novolog—has different physiological effects on the body than that of Lantus. Both doctors testified that they have significant experience with patients taking insulin medications—such as Lantus and Novolog—demonstrating that their opinions are reliable. As such, Dr. Neudecker and Dr. Brown are not basing their opinions solely on the temporal proximity of Defendant's actions and Plaintiff's injuries. Rather, they have demonstrated that, through their experience working as medical doctors with elderly patients with diabetes, it is their medical opinions that Plaintiff's injuries were caused by taking the wrong medication.

Defendant also complains that Dr. Neudecker and Dr. Brown's expert reports are

contradictory and fail to eliminate other possible causes for Plaintiff's injury. "[T]he factual

basis of an expert opinion goes to the credibility of the testimony, not the admissibility."

Bonner, 259 F.3d at 929 (citation omitted). "[Q]uestions of conflicting evidence must be

left for the jury's determination." Id. (citation omitted). Further, "an expert's opinion is

not required to resolve an ultimate issue of fact. It need only contribute to the jury's

understanding of the issue." Johnson, 2004 WL 742038, at *5. Dr. Neudecker and Dr.

Brown's opinions provide useful information relating to Plaintiff's medical history, the

medications Plaintiff was taking, and the effects Lantus and Novolog insulin medication

have on the body. Dr. Neudecker and Dr. Brown's opinions also provide a possible

explanation for the cause of Plaintiff's injuries. That Defendant may have other information

or another expert offering contradictory opinions, does not render their testimony

inadmissible. "Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence." Daubert, 509 U.S. at 596 (citation omitted). Accordingly,

Defendant's Motion to Exclude Testimony from Dr. Neudecker and Dr. Brown is denied.[1]

---

[1]      Defendant also argues that Dr. Neudecker and Dr. Brown's expert reports are
unreliable because they did not perform "differential diagnoses." (Def.'s Mem. at 29–
30.) While not requiring differential diagnosis for medical testimony to be admissible,
the Eighth Circuit has held that "a medical opinion about causation, based upon a proper
differential diagnosis, is sufficiently reliable to satisfy Daubert." Turner v. Iowa Fire
Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000). "In performing a differential diagnosis,
a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's
injury." Glastetter, 252 F.3d at 989. "The physician then 'rules out' the least plausible
causes of injury until the most likely cause remains." Id. "The final result of a
differential diagnosis is the expert's conclusion that a defendant's product caused (or did
not cause) the plaintiff's injury." Id. (citation omitted). Dr. Neudecker made it clear in
his deposition testimony that he had considered Plaintiff's other medications and other

## B. Expert Affidavits

Defendant also argues that it is entitled to summary judgment because Plaintiff failed to serve expert affidavits in compliance with Minn. Stat. § 145.682. In an action against a medical health care provider[2] in which "expert testimony is necessary to establish a prima facie case," the plaintiff must serve two affidavits on the defendant at designated times. Id. § 145.682 subd. 2.

The first affidavit ("expert review affidavit") must be submitted with the summons and complaint, or within 90 days of service of the summons and complaint if it could not be obtained before the statute of limitations expired. Id. subds. 2, 3. This affidavit "must be by the plaintiff's attorney" and must state that the attorney reviewed the case with an expert and that the expert believes the case has merit. Id. subd. 3. Failure to comply with the requirements of the expert review affidavit "within 60 days after demand for the affidavit results . . . in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case." Id. subd. 6(a) (emphasis supplied).

The second affidavit ("expert disclosure affidavit") must be served upon the

---

events in her life when analyzing what caused her injuries. Additionally, Dr. Brown testified that he performed a differential diagnosis in this case by specifically ruling out Plaintiff's other medications and conditions in her life before determining that the Novolog medication caused her fall. As such, Defendant's argument that Plaintiff's experts did not perform differential diagnoses is without merit.

[2]    "[H]ealth care provider" is defined as "a physician, surgeon, dentist, or other health care professional or hospital, including all persons or entities providing health care as defined in section 145.61, subdivisions 2 and 4." Minn. Stat. § 145.682, subd. 1. The definition of "professional" set forth in Minn. Stat. § 145.61, subd. 2 includes "a person licensed or registered . . . to practice as a pharmacist."

defendant within 180 days after commencement of the suit.  See id., subd. 2, 4(a).  The expert disclosure affidavit must: (1) be signed by the plaintiff's attorney and all the experts, (2) identify the experts that are expected to testify, (3) provide "the substance of the facts and opinions to which the expert is expected to testify," and (4) provide a summary of the grounds of each opinion.  Id., subd. 4(a).  Answers to interrogatories may substitute for the expert disclosure affidavit, as long as they are provided within the requisite 180 days and contain the required information.  Id.

If a plaintiff fails to comply with the requirements of the expert disclosure affidavit, the general result is mandatory dismissal with prejudice of each action as to which expert testimony is necessary to establish a prima facie case.  The court may extend the time for serving the affidavit, even after the time limits have expired, upon a showing of good cause.  Id., subd. 4(b).  In 2002, the Minnesota Legislature added a safe-harbor provision for plaintiffs who are deficient in attempts to comply with the expert disclosure affidavit.  See Broehm v. Mayo Clinic Rochester, 690 N.W.2d 721, 725 n.1 (Minn. 2005).  The safe-harbor provision was added to the statute because there was a "perception that meritorious medical malpractice claims were being dismissed where the expert disclosure affidavit was only missing some technical information that could be corrected."  Brown–Wilbert, Inc. v. Copeland Buhl & Co., 732 N.W.2d 209, 217 (Minn. 2007) (citation omitted).  The safe-harbor provision states that dismissal is only appropriate if:

(1) the motion to dismiss the action identifies the claimed deficiencies in the affidavit or answers to interrogatories;

(2) the time for hearing the motion is at least 45 days from the date of service of the motion; and

(3) before the hearing on the motion, the plaintiff does not serve upon the
defendant an amended affidavit or answers to interrogatories that correct
the claimed deficiencies.

Minn. Stat. § 145.682, subd. 6(c). The statute does not limit the safe-harbor provision to

only certain types of deficiencies. Wesley v. Flor, 806 N.W.2d 36, 41 (Minn. 2011).

### 1. Expert Review Affidavit

Defendant argues that Plaintiff failed to comply with Minn. Stat. § 145.682 because

her expert review affidavit did not contain her attorney's signature as required by the

Minnesota statute. The affidavit of expert review "must be by the plaintiff's attorney" and

"must state that the attorney has reviewed the case with an expert and that the expert

believes the case has merit." Wesely, 806 N.W.2d at 40 (citing Minn. Stat. § 145.682, subd.

3(a)).

Plaintiff submitted with her Complaint an affidavit of licensed pharmacist Douglas

Kassa, stating that he had "reviewed the records relating to the sale and dispensing of a

prescription for [Plaintiff]" and concluded that the "error in dispensing the wrong

pharmaceutical to [Plaintiff was] a deviation from the standard of care for a pharmacy in the

State of Minnesota." (Compl., Ex. D.) Plaintiff also submitted an affidavit with her

Complaint from Dr. Neudecker, who stated that he had treated Plaintiff "in his capacity of a

doctor at the Family Medical Center." (Id. Ex. E.) Dr. Neudecker stated that in his opinion

the incorrect prescription being dispensed to her "led to her worsening symptoms or new

symptoms of anxiety, worry, insomnia, irritability and nervousness." (Id.) He also

attributed Plaintiff moving out of her house to reside in a nursing home to "complications

caused by the wrong medication." (Id.)  Plaintiff did not submit an affidavit with her Complaint from her attorney stating that he had reviewed the case with the experts.  (Cf. id.)

Defendant seeks dismissal of Plaintiff's claim for failure to follow the expert review affidavit requirements.  A failure to provide the required expert review affidavit within 60 days after demand for it requires mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case.  See Minn. Stat. § 145.682, subd. 6(a).  Defendant has not cited any demand that it made to Plaintiff with respect to the expert review affidavit.

The Court concludes that Plaintiff may have failed to technically comply with the expert review affidavit requirements because the affidavits submitted by Plaintiff with her Complaint were signed by Douglas Kassa and Dr. Neudecker.  Plaintiff's attorney did not submit an affidavit as required by Minn. Stat. § 145.682 and the Minnesota Supreme Court. See Wesely, 806 N.W.2d at 40 (citing Minn. Stat. § 145.682, subd. 3(a)).  Dismissal with prejudice is inappropriate, however, because Defendant has not shown that it made any demand to Plaintiff regarding the required expert review affidavit or that Plaintiff failed to adequately respond within 60 days.  Minn. Stat. § 145.682, subd. 6(a).  If Defendant makes a demand to Plaintiff with respect to her expert review affidavit, she will then have 60 days to correct any deficiencies.

### 2.  Expert Disclosure Affidavit

Defendant next argues that Plaintiff failed to meet the requirement under Minn. Stat. § 145.682, subd. 2(2) because she only provided the affidavits attached to her Complaint and has not since submitted an expert disclosure affidavit.  (Def.'s Mem. at 42.)  Defendant

contends the affidavits attached to Plaintiff's Complaint cannot qualify as expert disclosures because they "contained only a general statement of causation" and they were "not signed by Plaintiff's attorney." (Id.) While Plaintiff also attached letters from Dr. Neudecker and Dr. Brown to the expert disclosures she served on or about April 13, 2012, Defendant argues that was insufficient to qualify as expert disclosure affidavits because they contain "nothing more than a general statement of causation and, in any event, neither were signed by Plaintiff's attorney." (Id.) Defendant seeks mandatory dismissal based on these alleged deficiencies. (Id.)

Plaintiff alleges that she served on Defendant expert witness disclosures "in the format of expert interrogatory answers" on April 13, 2012—161 days after the commencement of this action. (Pl.'s Mem. at 25). Plaintiff subsequently amended those disclosures on October 3, 2012 to include the signatures of the experts that were expected to testify. (Id. at 26.) Plaintiff also attached the reports of the experts to the disclosures. (Id.) Plaintiff argues that her amended expert disclosures qualify as expert interrogatories under Minn. Stat. § 145.682. (Id.)

Minn. Stat. § 145.682 subds. 2 and 4 requires that the plaintiff serve upon the defendant, within 180 days after commencement of the suit, an "affidavit" or "[a]nswer[] to interrogatories" signed by each expert and the plaintiff's attorney. The affidavit or interrogatory response must "identify each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected testify, and a summary of the grounds for each opinion. Id. subd. 4.

An "affidavit, by definition, is 'a statement reduced to writing and the truth of which is _sworn_ to before someone who is authorized to administer an oath.'" Elder-Keep v. Aksamit, 460 F.3d 979, 984 (8th Cir. 2006) (citing Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985) (emphasis added)).  Additionally, 28 U.S.C. § 1746 requires that the affiant declare, under penalty of perjury, that the facts in the affidavit are true.  Id.  An interrogatory is a question posed by one party to another party seeking information relevant to the action.  See Fed. R. Civ. P. 33.  "[A] party may serve on any other party no more than 25 written interrogatories, including all discrete subparts," and the interrogatory must be answered or objected to by the party to which the interrogatory is directed.  Id.  If a Plaintiff's affidavit or interrogatory of expert disclosure is deficient, the case will be dismissed with prejudice as long as (1) the motion to dismiss the action identifies the claimed deficiencies in the affidavit or answers to interrogatories, (2) the time for hearing on the motion is at least 45 days from the date of service of the motion; and (3) before the hearing on the motion the plaintiff does not serve upon the defendant an amended affidavit or answers to interrogatories that correct the claimed deficiencies. Minn. Stat. § 145.682 subd. 6(c).

Here, Plaintiff submitted an expert witness disclosure under the Court's Pretrial Scheduling Order (Doc. No. 13) and Federal Rule of Civil Procedure 26(a)(2), stating that Plaintiff may call as expert witnesses Dr. Michael Neudecker, Douglas Kassa, Dr. Michael Brown, and Linda Graham.  (Angell Aff., Doc. No. 20, Ex. 49.)  The expert witness disclosure attached the reports of each of the potential experts and was signed by the Plaintiff's attorney on April 13, 2012.  (Id.).  Plaintiff then amended her expert

witness disclosure in October 2012.  (Moehrle Aff., Doc. No. 23, Ex. H.)  The amended disclosure was signed by each potential expert and clarified that the reports of each potential expert was attached in compliance with Minn. Stat. § 145.682 subd. 4(a).  (Id.) The reports attached to Plaintiff's amended expert witness disclosure set forth the experts' opinions as to the standard of care required of a pharmacist, their opinion that Defendant breached that standard of care, and that Defendant's actions caused Plaintiff's injuries.  (Id.)

The Court agrees with Defendant that Plaintiff's expert witness disclosure submitted under the Court's Pretrial Scheduling Order and Federal Rule of Civil Procedure 26(a)(2) is technically deficient under Minn. Stat. § 145.682 subds. 2, 4.  While the Minnesota statute allows for an affidavit or interrogatory response to comply with the expert disclosure requirements, Plaintiff failed to submit either an expert affidavit or an interrogatory response.  The Eighth Circuit has stated that an affidavit must be "sworn to before someone who is authorized to administer an oath."  Elder-Keep, 460 F.3d at 984.  Here, Plaintiff's experts signed the amended expert witness disclosure but there is nothing that indicates that the potential experts declared "under penalty of perjury" that the facts are true.  28 U.S.C. § 1746.  There is also no indication that anyone who is authorized to administer an oath was present when each expert signed the disclosure.  Additionally, the record demonstrates that Defendant never provided Plaintiff with an interrogatory seeking information about Plaintiff's expert witnesses.  Plaintiff has not submitted any responses to Defendant's interrogatories that comply with Minn. Stat. § 145.682's requirements.

While a deficiency in a Plaintiff's expert disclosure affidavit may result in mandatory

dismissal with prejudice of each action as to which expert testimony is necessary to establish a prima facie case, a showing of good cause for an extension of the 180-day time limit pursuant to Minn. Stat. § 145.682, subd. 4(b) may justify relief from the mandatory filing time required under the statute. Lindberg v. Health Partners, Inc., 599 N.W.2d 572, 578 (Minn. 1999). A plaintiff seeking an extension of time for good cause must demonstrate excusable neglect. Stern v. Dill, 442 N.W.2d 322, 324 (Minn. 1989). To meet this standard, a plaintiff has the burden to show that: (1) he has a reasonable case on the merits; (2) he has a reasonable excuse for non-compliance with the statutory deadline;(3) he acted with due diligence; and (4) the defendant would not suffer substantial prejudice if an extension of time is granted. Anderson v. Rengachary, 608 N.W.2d 843, 850 (Minn. 2000).

The Court concludes that Plaintiff has a reasonable case on the merits and has attempted in good faith to comply with the requirements of Minn. Stat. § 145.682 in a timely manner. The Court also finds that Defendant would not suffer substantial prejudice because the Plaintiff already attached the expert reports and Defendant has already deposed Plaintiff's experts expected to testify at trial. The Court therefore concludes that Plaintiff has shown good cause for an extension and dismissal with prejudice is inappropriate. The Plaintiff will have ten days from the date of this Order to serve upon the Defendant an expert disclosure affidavit meeting the requirements of Minn. Stat. § 145.682.

Based on the foregoing, and all the files, records, and proceedings herein

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Motions to Exclude Expert Testimony and for Summary Judgment (Doc. No. 16) are **DENIED**.

2. Plaintiff must serve an expert review affidavit within 60 days if Defendant makes a demand for the affidavit under Minn. Stat. § 145.682, subd. 6(a).  The Court notes that an "affidavit, by definition, is 'a statement reduced to writing and the truth of which is <u>sworn</u> to before someone who is authorized to administer an oath.'" <u>Elder-Keep</u>, 460 F.3d at (citation omitted).  Additionally, 28 U.S.C. § 1746 requires that the affiant declare, under penalty of perjury, that the facts in the affidavit are true.  <u>Id.</u>  The expert review affidavit must be by the <u>Plaintiff's attorney</u> and state: (a) the facts of the case have been reviewed by the plaintiff's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial; and (b) that in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that caused injury to the plaintiff.  <u>See</u> Minn. Stat. § 145.682, subd. 3(a).

3. Within 10 days of this Order, Plaintiff must serve Defendant with an expert disclosure affidavit pursuant to Minn. Stat. § 145.682, subd. 4.  The sworn affidavit must be signed by <u>each expert listed in the affidavit</u> and by the <u>plaintiff's attorney</u> and notarized and state: (a) the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation; (b) the substance of the facts and opinions to which the expert is expected to testify; and (c) a summary of the grounds for each opinion.  Minn. Stat. § 145.682, subd. 4(a).  Given that the purpose of this order is to correct any technical

deficiencies and that expert depositions have been taken in this case and the case is scheduled for trial, the opinions may not differ from those already provided by these experts.

Dated: January 24, 2013           s/ Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge